UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FILED

MAR 2 9 2005

CLERK'S OFFICE
DETROIT

RALPH ALBERTUS HOXIE,

Petitioner,

v.

DOUG VASBINDER,

Respondent.

_____/

CASE NO. 03-CV-73397-DT
CHIEF JUDGE BERNARD A. FRIEDMAN
MAGISTRATE JUDGE PAUL J. KOMIVES

## REPORT AND RECOMMENDATION

*Table of Contents*

I.    RECOMMENDATION .................................................................. 2
II.   REPORT .......................................................................... 2
      A.   *Procedural History* ...................................................... 2
      B.   *Factual Background Underlying Petitioner's Conviction* ................... 4
      C.   *Procedural Default* ..................................................... 10
      D.   *Standard of Review* ..................................................... 14
      E.   *Miranda Claim (Claim I)* ................................................ 16
           1.   *Clearly Established Law* ........................................... 16
           2.   *Analysis* .......................................................... 16
      F.   *Ineffective Assistance of Counsel Claims (Claim II)* .................... 18
           1.   *Clearly Established Law* ........................................... 20
           2.   *Analysis* .......................................................... 20
                a. Questioning of Witnesses ......................................... 21
                b. Failure to Call Witnesses ........................................ 21
                c. Failure to Secure Exculpatory Evidence ........................... 22
           3.   *Appellate Counsel* ................................................. 23
      G.   *Denial of Discovery/Suppression of Evidence Claims (Claim III)* ......... 24
           1.   *Clearly Established Law* ........................................... 25
           2.   *Analysis* .......................................................... 25
      H.   *Conclusion* ............................................................. 26
III.  NOTICE TO PARTIES REGARDING OBJECTIONS .......................................... 28
                                                                                     29

I.    RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.   REPORT:

A.    *Procedural History*

1.    Petitioner Ralph Albertus Hoxie is a state prisoner, currently confined at the G. Robert Cotton Correctional Facility in Jackson, Michigan.

2.    On January 29, 1999, petitioner was convicted of two counts of first degree criminal sexual conduct (CSC-I), MICH. COMP. LAWS § 750.520b; and one count of second degree criminal sexual conduct (CSC-II), MICH. COMP. LAWS § 750.520c, following a jury trial in the Sanilac County Circuit Court.   On March 1, 1999, he was sentenced to concurrent terms of 15-30 years' imprisonment for each of the CSC-I convictions, and to a concurrent term of 3-15 years' imprisonment for the CSC-II conviction.

3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

   I.    DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN THAT HIS ORIGINAL ATTORNEY FAILED TO CONDUCT ANY INVESTIGATION OR OBTAIN DISCOVERY.

   II.   THE PROSECUTOR'S MISCONDUCT IN FAILING TO DISCLOSE EXCULPATORY EVIDENCE, UNDULY INFLUENCING DEFENDANT'S EXPERT WITNESS NOT TO TESTIFY, VOUCHING FOR THE CREDIBILITY OF WITNESSES AND IMPROPER ARGUMENT HAD THE CUMULATIVE EFFECT OF DENYING DEFENDANT A FAIR TRIAL.

   III.  THE TRIAL COURT'S CONDUCT, VIA ITS OBVIOUS LACK OF IMPARTIALITY AND BIAS TOWARD DEFENSE COUNSEL, DEPRIVED DEFENDANT OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND THE RIGHT TO PRESENT HIS DEFENSE.

2

IV.     THE TRIAL COURT'S DENIAL OF DEFENDANT'S MOTION FOR A
        NEW TRIAL BASED UPON NEWLY DISCOVERED EVIDENCE, I.E.,
        THE MAGNIFIED COLPOSCOPIC PHOTOGRAPHS OF THE VICTIM,
        AND THE ADDITION OF WITNESS, JEFFREY DOERR, WAS AN
        ABUSE OF DISCRETION.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

See *People v. Hoxie*, No. 218494, 2001 WL 637467 (Mich. Ct. App. May 25, 2001) (per curiam).

        4.      Petitioner sought leave to appeal these four issues to the Michigan Supreme Court.

The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See*

*People v. Hoxie*, 465 Mich. 936, 638 N.W.2d 754 (2001).

        5.      Petitioner thereafter filed a motion for relief from judgment in the trial court pursuant

to MICH. CT. R. 6.500-.508, raising the following claims:

        I.      DEFENDANT'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS
                AGAINST SELF-INCRIMINATION WERE VIOLATED WHERE
                DEFENDANT'S STATEMENT, GAINED WITHOUT *MIRANDA*
                WARNINGS, WAS USED AGAINST HIM AT TRIAL.

        II.     DEFENDANT'S SIXTH AMENDMENT RIGHTS WERE VIOLATED
                WHERE HE HAD INEFFECTIVE ASSISTANCE OF DEFENSE
                COUNSEL.

On June 11, 2002, the trial court denied petitioner's motion for relief from judgment.  Specifically,

the trial court found that petitioner's first claim had been fully litigated in the trial court and the

Michigan Court of Appeals.  Further, the trial court found that the evidence against petitioner was

overwhelming, and that he was therefore not prejudiced by any of counsel's alleged errors.  *See*

*People v. Hoxie*, No. 98-4876-FC (Sanilac County, Mich., Cir. Ct. June 11, 2002).  Petitioner sought

leave to appeal, raising as grounds for relief the two claims raised in the trial court, as well as a third

claim:

        III.    THE DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN THE

3

TRIAL COURT DENIED HIS MOTION FOR DISCOVERY FOR A COPY OF THE CULPOSCOPE PHOTOS THAT THE PROSECUTION POSSESSES OR KNEW ABOUT AND WOULD PROVE THE DEFENDANT'S INNOCENCE.

Both the Michigan Court of Appeals and the Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "fail[ure] to meet the burden of establishing entitlement to relief." *People v. Hoxie*, 468 Mich. 941, 664 N.W.2d 218 (2003); *People v. Hoxie*, No. 242433 (Mich. Ct. App. Dec. 16, 2002).

6.    Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on November 25, 2003. As grounds for the writ of habeas corpus, he raises the three claims that he raised in his state court motion for relief from judgment.

7.    Respondent filed his answer on June 14, 2004. He contends that petitioner's first claim and a portion of petitioner's second claim are barred by petitioner's procedural default in the state courts, and that the remainder of petitioner's claims are without merit.

8.    Petitioner filed a reply to respondent's answer on August 11, 2004.

B.    *Factual Background Underlying Petitioner's Conviction*

Petitioner was charged with two counts of CSC-I and one count of CSC-II arising from the sexual assaults, over a period of time, of petitioner's daughter, who was 11 years old at the time of the trial.

The prosecution first presented the testimony of Dr. Norman Carter, who was qualified as an expert. *See* Trial Tr., Vol. I, at 155-60. Dr. Carter testified that he examined the victim on May 27, 1998. Dr. Carter testified that a physical examination revealed loss of tissue and significant notching in the hymen, consistent with vaginal penetration on more than one occasion. *See id.* at 162-64.

4

The prosecution next called Leah Hoxie, petitioner's ex-wife and the victim's mother. In April of 1998, she spent five days in the hospital. For at least one night during this stay, her children, including the victim, stayed with petitioner. When she left the hospital, the victim told her something which caused her to call a counseling service and to confront petitioner. *See id.* at 194-99. When she confronted petitioner, he admitted that he had handled the victim inappropriately. *See id.* at 200-01. After this conversation, she contacted the counseling service. Several days later, she received a phone call from Michael Stevens, an employee of the Family Independence Agency. Subsequently the employee visited her home, along with Detective Brian Ferguson of the Michigan State Police. *See id.* at 201-03. They took a statement from her, and gave her a tape recording device. The prosecution then introduced a tape recording made by Leah Hoxie, as well as a written transcript of that recording. The recording consists of a conversation between Leah, petitioner, and the victim:

| | |
|---|---|
| BETH: | And Mom says you found -found my letter. What did you think about my letter? |
| CHIP: | That something had to be changed and–and first of all I have to tell you that there is no reason that you should feel bad. Uh, nothing serious, detrimental, bad occurred. It was just a simple body massage and– |
| LEAH: | Chip– |
| CHIP: | –what others have said– |
| LEAH: | Chip, she– |
| CHIP: | –is above and beyond. |
| LEAH: | Now, wait a minute. |
| CHIP: | Okay. |
| LEAH: | She told me you had your hand in her. That's not a body message, Chip. |
| CHIP: | Well, I think we're getting way, way beyond. But, I mean, this thing is–you're–you're talking about one or two incidents and perhaps that was a mistake. But it was– |
| LEAH: | What was a mistake? |
| CHIP: | It was not– |
| LEAH: | Whoa, back up. What was a mistake? That you had your hands in |

|        | her?                                                                                                                                                                                      |
|--------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| CHIP:  | That I touched her with my finger, yes.                                                                                                                                                     |
| LEAH:  | Touched her where with your finger?                                                                                                                                                        |
| CHIP:  | In the area of her vagina.                                                                                                                                                                  |
| LEAH:  | You–a back rub, even a body massage, has–has no business having your hands be anywhere near there.                                                                                          |
| CHIP:  | Well, okay. So I–what her note said and my immediate reaction was: Yes, this is not an acceptable. It is not acceptable on her part. It's no longer acceptable on my part.                   |
| LEAH:  | All right, now you're saying you actually touched her crotch once or twice. She told me it was more than that.                                                                              |
| CHIP:  | Once, twice, three times, not a lot. Not that many times.                                                                                                                                   |
| LEAH:  | Well, since when?                                                                                                                                                                          |
| CHIP:  | Over a period of about four or five or six months.                                                                                                                                         |

* * * *

|        |                                                                                                                                                                                           |
|--------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| LEAH:  | Well, that's part of the issue is I–I want to hear your version. She says it's been going on for two years every time she stayed over night with you.                                       |
| CHIP:  | No. Not every time.                                                                                                                                                                        |
| LEAH:  | I'd like to hear your version.                                                                                                                                                             |
| CHIP:  | Pardon?                                                                                                                                                                                    |
| LEAH:  | I'd like to hear your version.                                                                                                                                                             |
| CHIP:  | On a couple of occasions when Beth asked to sleep with me and asked for a body rub, then at one time or another it did get, perhaps, to a point where I touched her in an unfamiliar- in an infamiliar in an impersonal way. That's what I want. Okay. |
| BETH:  | You are such a liar.                                                                                                                                                                       |

* * * *

|        |                                                                                                                                                                                           |
|--------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| LEAH:  | All right, you've covered essentially what I was most concerned about.                                                                                                                     |
| CHIP:  | Which was?                                                                                                                                                                                 |
| LEAH:  | Well, what I hear is she said you had it your hand inside her and you're saying, "yes", you did. And, yes–                                                                                  |
| CHIP:  | That is a pretty big piece of real estate.                                                                                                                                                 |
| LEAH:  | All right, what? Index finger, thumb, I don't care.                                                                                                                                        |
| CHIP:  | The tip of my index finger, possibly. No more. And not intentionally to the–to–to–                                                                                                         |
| LEAH:  | Yeah, but, Chip, to be handling that part of her anatomy.                                                                                                                                  |
| CHIP:  | It was a mistake                                                                                                                                                                           |
| LEAH:  | There's no                                                                                                                                                                                 |

6

CHIP:       –and I grant that.
LEAH:       There's no reason for it.  If it was me, that's one thing.  But, you
            don't do that to a child!

*See id.* at 209-18.

The prosecution also presented the testimony of the victim.  She testified that on the evening she spent with her father while her mother was in the hospital, she asked him for a back rub.  He told her to wait until bedtime.  At bedtime, she went into petitioner's room and again asked for back rub. He agreed, and told her to take off her clothes.  She did and got into bed with him.  He rubbed her shoulders, back, buttocks, and knees.  He then rolled her over and rubbed her chest, stomach, and private areas.  *See* Trial Tr., Vol. II, at 139-40.  He rolled her over a few more times, and then penetrated her vagina with one of her fingers, twice.  *See id.* at 140.  The second time, she said "ow," and she went to lay down and go to sleep.  The next morning, she wrote petitioner a letter telling him that she didn't want him to do that again.  *See id.* at 141.  The victim also testified that petitioner had penetrated her with his fingers on a previous occasion at her mother's house.  On this occasion, she was watching television with her father and brothers, and asked petitioner for a back rub.  She got a blanket, and sat on his lap.  Petitioner put the blanket over her and rubbed her shoulders and back. He then rolled her over, removed her underwear, and penetrated her with his fingers.  *See id.* at 142-43.  On yet another occasion, petitioner gave her a back rub while she was naked.  Although petitioner did not penetrate her on this occasion, he did rub her private parts.  *See id.* at 143-44.  Over defense counsel's objection, the victim testified that petitioner did these things to her at least twenty to thirty times.  *See id.* at 147.

The prosecution also presented the testimony of Michael Stevens, the Family Independence Agency employee who interviewed the victim.  He spoke with Leah Hoxie and with the victim.

Eventually, he and Detective Ferguson spoke with petitioner. At that interview, petitioner admitted that he had penetrated his daughter's vagina with his fingers, but felt that his wife had blown the whole thing out of proportion. *See id.* at 196-97. Specifically, petitioner indicated that he had penetrated his daughter with his little finger to the first knuckle, and that this had happened three or four times. *See id.* at 197. Petitioner's description of the two incidents of penetration to which the victim testified were consistent with the victim's description of those incidents. *See id.* at 197-99.

Finally, the prosecution presented the testimony of Detective Ferguson. He testified that after speaking with Leah Hoxie and the victim, he went to their home with some recording equipment. A couple of days later, Leah Hoxie gave him an audiotape of the telephone conversation she had with petitioner. *See* Trial Tr., Vol. III, at 6-7. He testified that he made an appointment to talk with petitioner on May 29. Petitioner voluntarily appeared on that date. *See id.* at 14. The interview was conducted in Detective Ferguson's office, and he informed petitioner that petitioner was free to leave at any time. *See id.* at 15. Petitioner indicated that he had touched the victim's vagina during back rubs, but that it had happened only two to four times. He denied that he had touched the victim twenty to thirty times. *See id.* at 16. Petitioner stated that he touched the victim with his little finger. When confronted with the evidence of injury to the victim's vagina, petitioner said that he could not be the cause because he had only penetrated her with the tip of his little finger. Petitioner stated that he did not know that digital penetration was a sex act, and said that if that was a crime, then he did it. *See id.* at 17. Petitioner described the circumstances of the two incidents of penetration consistently with the victim's description of those two incidents. *See id.* at 18-20.

Petitioner presented a number of witnesses in his defense. Curtis Clelland, a long-time friend of petitioner, testified that petitioner was generally trustworthy and honest. *See id.* at 129, 131. He

8

also testified, however, that Leah Hoxie is also generally trustworthy and honest. *See id.* at 132-33. Nancy Spencer, petitioner's first wife, also testified that petitioner is honest and trustworthy. *See id.* at 135. She also testified that Leah Hoxie's reputation for truthfulness is not good, and that Leah Hoxie had been dishonest with her. *See id.* at 136-40. Ron Older, petitioner's brother-in-law, also testified that petitioner was honest and had a reputation for trustworthiness in the community. *See id.* at 143-44. He also testified that Leah Hoxie was not particularly honest. *See id.* at 145. James Doerr, similarly testified. *See id.* at 151-52. Eileen Konkel, a friend and neighbor of petitioner, testified that Leah Hoxie had cheated her in a business transaction, and that Leah Hoxie was jealous of petitioner. *See id.* at 161-62, 165.

Petitioner also presented the testimony of his mother, Lorraine Hoxie. She testified generally to petitioner's busy work schedule, and to her relationship with the victim. More specifically, she testified that she received a letter in October 1998 from Leah Hoxie describing the activities of the children. However, that letter did not contain any mention of the prosecution against petitioner, unlike similar letters that had been sent to other family members and friends. *See id.* at 180-81, 183. Leah Hoxie also never asked Lorraine Hoxie to help her or the victim. *See id.* at 182.

Petitioner next presented the testimony of Dr. Gary Ritten, an obstetrician/gynecologist. He testified that a colposcopy–a procedure used to examine the female genitalia which is essentially a magnifying lens–could be used to identify trauma to the hymen. *See id.* at 196-97. Dr. Ritten testified that the wound described in the colposcopy report prepared by the doctor who examined the victim would not likely have been the result of digital penetration. *See id.* at 207. He also testified that, if petitioner's digital penetration had caused the injury to the victim's hymen, that injury would likely have been fully healed by the time of the colposcopy six weeks later. *See id.* at 214.

9

Petitioner also testified on his own behalf. Petitioner testified that what had been described by the prosecution's witnesses did not happen. *See* Trial Tr., Vol. IV, at 28. He testified that he never gave the victim a massage by his choice, but only when she requested one. He had no intention of making sexual contact with her. *See id.* at 48-51. Petitioner explained that his responses to Leah Hoxie and the victim in the phone conversation were made because it was "easier to agree than to argue." *See id.* at 52. He testified that the victim became antagonistic toward him and very angry, and suggested that this was caused by Leah Hoxie. *See id.* at 64. The victim's testimony at trial appeared to him to be memorized. *See id.* at 66. He denied that he told Stevens and Detective Ferguson that he penetrated his daughter, and only admitted to touching her vaginal area "[b]ecause I thought that was what he wanted to hear based on the question that he was leading up to[.]" *See id.* at 83-85.

The jury found petitioner guilty of all three counts on which he was charged.

C.    *Procedural Default*

Respondent first contends that petitioner's first claim–alleging a *Miranda* violation–and the portion of his second claim alleging ineffective assistance of appellate counsel, are barred by petitioner's procedural default in the state courts. The Court should disagree.

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489

U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also, Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

Here, petitioner first presented his purportedly defaulted habeas claims in his motion for relief from judgment. Michigan Court Rule 6.508, governing motions for relief from judgment, provides that the movant "bears the burden of establishing entitlement to relief." MICH. CT. R. 6.508(D). The rule goes on to provide, in three separately numbered paragraphs, procedural situations in which relief will not be granted: (1) where an appeal relating to the conviction is pending; (2) where the claim has already been ruled upon in a prior appeal or postconviction motion; and (3) where the claim could have been raised in a prior appeal or postconviction motion but was not. *See* MICH. CT. R. 6.508(D)(1)-(3).

The Michigan Court of Appeals and the Michigan Supreme Court both rejected petitioner's appeal based on his "fail[ure] to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *See People v. Hoxie*, 468 Mich. 941, 664 N.W.2d 218 (2003); *People v. Hoxie*, No. 242433 (Mich. Ct. App. Dec. 16, 2002). Looking at the structure of Rule 6.508(D), it would appear that this language indicates that petitioner failed to meet the substantive burden of entitlement to relief, rather than failed to comply with one of the procedural aspects of the rule. This, in turn, would not constitute an invocation of a state procedural default barring habeas review of petitioner's claims. Respondent, however, relies on the Sixth Circuit's decision in *Simpson v. Jones*, 238 F.3d

11

399 (6th Cir. 2000), in which the court held otherwise and concluded that this identical language constitutes an invocation of the procedural aspects of Rule 6.508(D), and thus bars federal habeas review. *See Simpson v. Jones*, 238 F.3d 399, 408 (6th Cir. 2000).

Were *Simpson* the last word on the matter, this Court would of course be bound to follow the Sixth Circuit's holding. However, a more recent decision by the Sixth Circuit has limited the breadth of the *Simpson* rule, rendering it inapplicable here. In *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004), the Court explained that its previous decisions in *Simpson* and *Burroughs v. Makowski*, 282 F.3d 410 (6th Cir. 2003), were based on the fact that the lower state courts in those cases had expressly invoked the procedural aspect of Rule 6.508(D)(3), and therefore the court could be fairly certainly that the Michigan Supreme Court's citation to "MCR 6.508(D)" was intended as an invocation of the procedural aspect of that rule. In *Abela*, however, the lower courts had addressed the petitioner's claims on the merits, and this was enough to distinguish *Simpson* and *Burroughs*, as the court explained:

> In short, unlike in *Simpson* and *Burroughs*, the state courts below the supreme court never invoked a procedural bar here, but rather repeatedly ruled on the merits. The procedural circumstances in this case are, therefore, materially different from those in *Simpson* and *Burroughs*, where the lower state courts actually invoked a procedural bar, making it clearer that the Michigan Supreme Court was also invoking such a bar when it referred to M.C.R. 6.508(D). But given that all of the lower state courts adjudicated Abela's case on the merits, it is not at all clear that the Michigan Supreme Court's summary order relies on a procedural bar, as opposed to the non-procedural reason that Abela simply failed to meet his burden of "establishing entitlement to the relief requested." Indeed, given the line of prior merits determinations in Abela's case, it is just as reasonable to presume that the Michigan Supreme Court's reference to M.C.R. 6.508(D) signaled its agreement with the lower courts' merits determinations as it is to presume that the reference signaled, for the first time in this case, the invocation of a procedural bar.
>
> In short, the procedural facts of *Simpson* and *Burroughs* are distinguishable from our case. The facts in *Simpson* and *Burroughs* inspired greater certainty that the Michigan Supreme Court actually relied on a procedural bar in rendering its judgment. No such clarifying indicators are present here. Moreover, *Simpson* and

*Burroughs* do not purport to eviscerate our Circuit's rule that a state procedural rule is an "independent and adequate" state ground only if the state court rendering judgment in the case "clearly and expressly stated that its judgment rested on a procedural bar." *Sparkman*, 94 F.3d at 202. *Simpson* and *Burroughs* did not hold that we should divine procedural default from any and all references to M.C.R. 6.508(D) where such default may actually have occurred, but where the procedural history raises genuine questions as to the state court's actual reliance on a procedural bar. To suggest that those cases did so hold is to accept that they invert the inquiry into whether federal review of the habeas claims is permitted. That is, pursuant to *Maupin v. Smith*, 785 F.2d 135 (1986), whether the petitioner actually failed to comply with a procedural rule is only the predicate, not the ultimate, question before us. The ultimate legal questions are whether the court relied on and expressly invoked that procedural bar and whether it is an "independent and adequate" ground for precluding review. *See Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir.2001). If a state court is slurring its words, our job is not to guess what it might be saying, but rather to demand that it enunciate more clearly. Here, because of numerous factors--the Michigan Supreme Court's reference only to M.C.R. 6.508(D), the absence of a clear and express invocation of a procedural bar, and the plausibility, based on the prior state courts' merits rulings, that the Michigan Supreme Court, too, grounded its decision in a non-procedural reason based on Abela's failure to "establish[] entitlement to relief"–we cannot find that M.C.R. 6.503(D)(3), the state procedural rule urged by Respondent, was actually relied on by the Michigan Supreme Court in this case. For the same reasons, we cannot find that M.C.R. 6.503(D) constitutes an adequate and independent basis for the state supreme court's decision here.

*Abela*, 380 F.3d at 923-24; *see also*, *Williams v. Jones*, 231 F. Supp. 2d 586, 597 (E.D. Mich. 2002) (Lawson, J.).

Here, as in *Abela*, the trial court did not reject petitioner's claims on the basis of his failure to raise those claims on direct appeal, *i.e.*, under the procedural rule set forth in Rule 6.508(D)(3). Rather, the trial court found (albeit, it appears from the record, incorrectly) that petitioner's first claim had already been litigated and decided against him on the merits. This constitutes a reliance on Rule 6.508(D)(2), which establishes a *res judicata* rule that does not constitute a procedural bar to federal habeas review. *See Hicks v. Straub*, 377 F.3d 538, 557 n.17 (6th Cir. 2004). With respect to petitioner's ineffective assistance of counsel claims, the trial court explicitly rejected those claims on the merits, finding that petitioner could not establish that he was prejudiced in light of the

13

overwhelming evidence of guilt. *See People v. Hoxie*, No. 98-4867-FC, at 2 (Sanilac County, Mich., Cir. Ct. June 11, 2002). Thus, in the legally relevant respects this case is identical to *Abela*, and under that decision petitioner's claims are not defaulted. Accordingly, the Court should conclude that petitioner's claims are not barred by a procedural default.

D.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>      (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>      (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also, Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

14

(quoting *Williams*, 529 U.S. at 405-06); *see also, Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also, Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also, Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases -indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts

them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements

of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the

decisions of lower federal courts are useful in assessing the reasonableness of the state court's

resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v.

Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich.

2002) (Tarnow, J.).

E.      *Miranda Claim (Claim I)*

Petitioner first claims that he was denied his Fifth Amendment right to remain silent when

the prosecutor introduced his statements to Detective Ferguson even though he was never advised

of his constitutional rights. The Court should conclude that petitioner is not entitled to habeas relief

on this claim.

1.      *Clearly Established Law*

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court considered the applicability

of the Fifth Amendment's Self-Incrimination Clause to custodial interrogations by the police. The

Court ruled that, in some circumstances, statements made while in custody can violate the Self-

Incrimination Clause even if the statement was otherwise "voluntary" under the Due Process Clause.

As the Court has more recently explained, the *Miranda* decision

> concluded that the coercion inherent in custodial interrogation blurs the line between
> voluntary and involuntary statements, and thus heightens the risk that an individual
> will not be "accorded his privilege under the Fifth Amendment . . . not to be
> compelled to incriminate himself." [*Miranda*, 384 U.S.] at 439. Accordingly, we laid
> down "concrete guidelines for law enforcement agencies and courts to follow." *Id.*,
> at 442. Those guidelines established that the admissibility in evidence of any
> statement given during custodial interrogation of a suspect would depend on whether
> the police provided the suspect with four warnings. These warnings (which have
> come to be known colloquially as "Miranda rights") are: a suspect "has the right to
> remain silent, that anything he says can be used against him in a court of law, that he

has the right to the presence of any attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires." *Id.*, at 479.

*Dickerson v. United States*, 530 U.S. 428, 435 (2000) (parallel citations omitted). The *Miranda* Court explained that if the suspect indicates that he wishes to remain silent, "the interrogation must cease." *Miranda*, 384 U.S. at 474. Similarly, if the suspect requests counsel "the interrogation must cease until an attorney is present." *Id.*; *see also*, *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Although it has been characterized otherwise at times, the rule of *Miranda* is of federal constitutional dimension. *See Dickerson*, 530 U.S. at 438-40. Thus, claims based on the right to counsel at questioning recognized in *Miranda* are cognizable on habeas review. *See id.* at 439 n.3; *Thompson v. Keohane*, 516 U.S. 99, 107 n.5 (1995).

The *Miranda* rule protects a suspect's Fifth Amendment privilege not to be "compelled" to incriminate himself. The rule is based on the notion that "custodial police interrogation, by its very nature, isolates and pressures the individual," and therefore "the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.'" *Dickerson*, 530 U.S. at 435 (quoting *Miranda*, 384 U.S. at 439). To guard against this, *Miranda* "laid down 'concrete guidelines for law enforcement agencies and courts to follow.'" *Id.* (quoting *Miranda*, 384 U.S. at 442). This rationale for the rule, however, also limits its applicability to only those interrogations which are "custodial." *See Thompson*, 516 U.S. at 102; *California v. Beheler*, 463 U.S. 1121, 1124 (1983) (per curiam); *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977) (per curiam). "Custody for *Miranda* purposes has been . . . narrowly circumscribed." *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984). As the Court explained in *Miranda*, an interrogation is custodial only where the suspect "has been taken into custody or

17

otherwise deprived of is freedom of action in any significant way." *Miranda*, 384 U.S. at 444. In other words, although a court must consider the totality of the circumstances surrounding the interrogation, the ultimate inquiry is whether there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Murphy*, 465 U.S. at 430 (internal quotation omitted); *see also, Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *Beheler*, 463 U.S. at 1125. For purposes of habeas review, the ultimate issues of whether petitioner's interrogation was custodial is a determinations to be reviewed under § 2254(d)(1). *See Thompson*, 516 U.S. at 112-13 (determination of whether interrogation was a "custodial interrogation" under *Miranda* is a legal determination not subject to the presumption of correctness for state court findings of historical fact).

2.    *Analysis*

It is undisputed that petitioner was not advised of his rights under *Miranda* either prior to, or during the course of, his interview by Detective Ferguson and Mr. Stevens. The only question here is whether that interview was a custodial one to which *Miranda* applies.

Petitioner does not contend that he was formally arrested prior to the interview. Nor do the facts establish that his freedom of movement was restrained to the degree associated with formal arrest. On the contrary, at the evidentiary hearing on petitioner's motion to suppress in state court, both Detective Ferguson and petitioner testified that petitioner voluntarily appeared at the State Police post in response to Detective Ferguson's request, that there was a significant lapse of time between Detective Ferguson's request and the interview, and that the interview was scheduled at a mutually convenient time. *See* Walker Hr'g Tr., at 6, 30, 48. Detective Ferguson testified that he told petitioner that petitioner was not under arrest and was free to leave at any time. *See id.* at 8.

18

Although petitioner did not have a specific recollection of this comment, he did not deny that it was made. *See id.* at 31, 47. Petitioner was not restrained in any way during the interview, *see id.* at 9, and the interview lasted only about 30 minutes to one hour, *see id.* at 11, 33. Further, petitioner was allowed to leave after the conclusion of the interview, and was not arrested until about 10 days later. *See id.* at 21-22, 23, 37, 48. Similar facts have been held insufficient to establish that an interrogation was custodial. *See Mathiason,* 429 U.S. at 494; *Mason v. Mitchell,* 320 F.3d 604, 632 (6th Cir. 2003); *United States v. Protsman,* 74 Fed. Appx. 529, 535 (6th Cir. 2003).[1]

Petitioner offers two arguments against this conclusion. First, he argues that, regardless of what Detective Ferguson may have told him, he did not in fact feel that he was free to end the interview and leave at any time. Second, he argues that the custodial nature of the interview is demonstrated by the fact that the police were interrogating him as a suspect in a crime. Each of these arguments is without merit because, as the Supreme Court has explained, "the initial determination of custody depends upon the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury,* 511 U.S. at 323.

Thus, petitioner's subjective belief that he was not free to leave does not affect the analysis. Rather, "the only relevant inquiry is how a reasonable man in [petitioner]'s position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984); *see also, Thompson,* 516 U.S. at 112; *United States v. Salvo,* 133 F.3d 943, 948 (6th Cir. 1998). For the reasons explained above, a reasonable person in petitioner's position would have felt free to end the interview and

_____

[1]The fact that the interview took place at the State Police post, rather than at petitioner's home or some public place, does not alter this conclusion. *See Beheler,* 463 U.S. at 1125-26; *United States v. LeBrun,* 363 F.3d 715, 722 (8th Cir. 2004) (en banc).

leave at any time. Similarly, "[i]t was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda* requirements with regard to custodial interrogation." *Beckwith v. United States*, 425 U.S. 341, 346-47 (1976) (internal quotation omitted). Thus, the *Miranda* requirements do not extend to the otherwise non-custodial interrogation merely because Detective Ferguson had focused on petitioner as a suspect in a criminal case. *See Stansbury*, 511 U.S. at 323-34; *Berkener*, 468 U.S. at 442; *Murphy*, 465 U.S. at 431; *Mathiason*, 429 U.S. at 495.

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Ineffective Assistance of Counsel Claims (Claim II)*

Petitioner next contends that his trial and appellate counsel were ineffective in a number of respects. Specifically, he contends that trial counsel was ineffective for failing to: (1) properly question witnesses; (2) call defense witnesses; and (3) secure the colposcope photos and the testimony of an expert witness, Dr. Guertin. Petitioner also contends that appellate counsel was ineffective, apparently for failing to raise these claims on direct appeal. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id.* at

687. These two components are mixed questions of law and fact. *See id.* at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

    2.    *Analysis*

        *a.  Questioning of Witnesses*

Petitioner first contends that counsel's questioning of the witnesses was deficient. Although petitioner cites to two instances in the trial transcript in which counsel was admonished by the judge for asking incoherent questions and deliberately trying to elicit objectionable testimony, he does not indicate any specific questions asked by counsel which were inappropriate, nor does he identify any questions not asked by counsel that should have been asked.

"[C]ourts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Dell v. Straub*, 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002). "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Id.* Here, the record shows that counsel ably presented extensive evidence on petitioner's behalf, and thoroughly cross-examined the prosecution's witnesses. That some unidentified questions may have been inartfully phrased does not support a finding that counsel's performance was deficient. *See Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 607 (E.D. Mich. 2001). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. *Failure to Call Witnesses*

Petitioner also contends that counsel was ineffective for failing to call witnesses on his behalf. The only witness specifically identified is Jeffrey Doerr, who was apparently another character witness but whom counsel had failed to list as a witness. *See* Trial Tr., Vol. III, at 117.

With respect to Jeffrey Doerr, petitioner cannot establish that he was prejudiced by counsel's failure to secure this witness's testimony. Counsel presented a number of character witnesses who testified as to both petitioner's and Leah Hoxie's character for honesty. One additional character witness would not have altered the jury's assessment of the evidence, particularly in light of the overwhelming evidence of guilt. *See Cannon v. Mullin*, 383 F.3d 1152, 1165 (10th Cir. 2004); *Dibble v. United States*, 103 Fed. Appx. 593, 596 (6th Cir. 2004).

To the extent that petitioner contends counsel failed to call other, unidentified witnesses, the claim fails. Petitioner "has identified no exculpatory evidence or additional defensive theories that would have been discovered or developed had his counsel [called additional unidentified witnesses].

22

2:03-cv-73397-BAF-PJK Doc # 41 Filed 03/29/05 Pg 23 of 29 Pg ID 135

... Thus, those assertions of ineffective assistance do not satisfy the prejudice prong of *Strickland*."
*Flores v. Johnson*, 957 F. Supp. 893, 913 (W.D. Tex. 1997); *see also, Jones*, 76 F.3d at 841 (defense
counsel has a duty only to pursue those defenses reasonably suggested by the factual circumstances
surrounding the case); *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994).

### c. Failure to Secure Exculpatory Evidence

Finally, petitioner contends that counsel was ineffective for failing to secure and present
various exculpatory evidence. The court should conclude that petitioner is not entitled to habeas
relief on each of these claims.

First, petitioner contends that counsel was ineffective for failing to secure a copy of the
colposcopy pictures. However, as discussed below in connection with petitioner's suppression of
evidence claim, petitioner cannot show that this evidence was material. *See infra* part G.2.b. He
thus cannot show that he was prejudiced by counsel's failure to secure these photographs. *See
Brown v. Head*, 272 F.3d 1308, 1316 (11th Cir. 2001) (noting that *Brady* materiality and *Strickland*
prejudice are the same, and that a petitioner who cannot establish one therefore cannot establish the
other); *Anderson v. Bowersox*, 262 F.3d 839, 842 (8th Cir. 2001) (same); *United States v. Spawn
Optical Research, Inc.*, 864 F.2d 1467, 1474 n.6 (9th Cir. 1988) (same).

Petitioner also contends that counsel was ineffective in failing to properly support his claim
regarding the prosecutor's alleged intimidation of petitioner's expert witness. Apparently, during
trial but on a day that the trial had been cancelled due to the weather, counsel was speaking with
petitioner's then-expert witness, Dr. Guertin. The prosecutor entered the room and asked to speak
with the witness. The prosecutor provided to Dr. Guertin petitioner's confession and the tape

23

recorded conversation petitioner had with Leah Hoxie and the victim.[2] Dr. Guertin then refused to testify on petitioner's behalf. *See* Mot. Hr'g Tr., dated 1/19/99, at 7-10. The trial court denied petitioner's motion to dismiss based on counsel's failure to provide any evidence, either via Dr. Guertin's testimony or affidavit, supporting his claim. *See id.* at 23-24. Petitioner contends that counsel was ineffective for failing to properly support his claim regarding the prosecution's alleged intimidation of his expert witness.

Even assuming that the prosecutor did, in fact, improperly intimidate Dr. Guertin, petitioner can show neither that he was denied a fair trial thereby nor that he was prejudiced by counsel's performance in connection with the issue. Although the trial court denied petitioner's motion, he did grant petitioner a continuance to secure an expert witness, and as detailed above petitioner presented the expert testimony of Dr. Gary Ritten. Dr. Ritten's testimony covered all of the bases which petitioner's counsel indicated would have been covered by Dr. Guertin. *Compare* Mot. Hr'g Tr., dated 1/19/99, at 6, with Trial Tr., Vol. III, at 196-214. Because petitioner was able to present his expert testimony, and because there is no evidence that Dr. Guertin would have been more qualified or more persuasive than Dr. Ritten, petitioner cannot show he was prejudiced by the alleged intimidation of Dr. Guertin, or by counsel's handling of the issue. *See United States v. Deering*, 179 F.3d 592, 595 (8th Cir. 1999) (no prejudice from prosecutor's intimidation of witness whose testimony would have been cumulative of evidence presented at trial).

3.    *Appellate Counsel*

Petitioner also contends that he was denied the effective assistance of appellate counsel due

---

[2] The prosecutor disputed this version of events, although he admitted to speaking briefly with Dr. Guertin.

to counsel's failure to raise his claims on direct appeal. The Court should conclude that petitioner is not entitled to habeas relief on this claim because he cannot establish prejudice from counsel's failure to raise these claims on direct appeal. In the appellate counsel context, a showing of prejudice requires a showing that petitioner's claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). As explained in this Report, all of petitioner's claims are without merit, and thus petitioner cannot show that counsel was ineffective for failing to raise them on direct appeal.

G.      *Denial of Discovery/Suppression of Evidence Claims (Claim III)*

Finally, petitioner contends that he was denied a fair trial by the prosecutor's suppression of the colposcopy photo. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. However, "there is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Thus, in order to establish a *Brady* violation, petitioner must show that the prosecutor (1) withheld evidence that was both (2) favorable to the accused and (3) material to guilt or punishment. *See United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988). Furthermore, regardless of the exculpatory nature or materiality of the evidence withheld by the prosecution, "[n]o *Brady* violation exists where a defendant knew or should have known the essential facts permitting him to take advantage of any

25

exculpatory information, or where the evidence is available to defendant from another source."
*United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991) (citations omitted) (internal quotation
omitted); *accord United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994). Thus, petitioner's
claim raises three questions: (1) was the evidence suppressed by the prosecution in that it was not
known to petitioner and not available from another source?; (2) was the suppressed evidence
favorable or exculpatory?; and (3) was the evidence material to the question of petitioner's guilt?
*See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *Luton v. Grandison*, 44 F.3d 626, 628-29 (8th
Cir. 1994); *see also, Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Moore v. Illinois*, 408 U.S.
786, 794-95 (1972). Petitioner bears the burden of establishing each of these three elements. *See
Carter*, 218 F.3d at 601. If all three of these questions are answered in the affirmative, petitioner has
established a constitutional error entitling him to the writ of habeas corpus, and "there is no need for
further harmless-error review." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). If, on the other hand,
any of these three questions is answered in the negative, then petitioner has failed to establish a
*Brady* violation.

    2.    *Analysis*

    The Court should conclude that petitioner's *Brady* claim fails both because he has failed to
show that the photographs were suppressed by the prosecution and because the photographs were
not material.

    First, there is no evidence that the colposcopy photos were ever in the prosecution's
possession. Rather, they were merely part of the hospital file maintained by Dr. Carter. Apparently,
neither the prosecutor nor defense counsel were aware of the photographs until Dr. Carter testified.
*See* Mot. Hr'g Tr., dated 1/19/99, at 33-34; Sentencing Tr., at 84-85. Suppression under *Brady*

occurs only where the prosecution fails to disclose evidence in its possession, or in the possession of other state actors, such as police, acting on behalf of the prosecution. *See Kyles*, 514 U.S. at 435-40. Dr. Carter is not considered an arm of the state for determining whether this information was in the possession of the prosecution. *See Hill v. Johnson*, 210 F.3d 481, 489 (5th Cir. 2000). Thus, petitioner has not shown that the prosecution suppressed any evidence known to it within the meaning of *Brady*. *See Hill*, 210 F.3d at 489; *see also, United States v. Hansen*, 262 F.3d 1217, 1234-35 (11th Cir. 2001); *Smith v. Massey*, 235 F.3d 1259, 1276 (10th Cir. 2000).

Further, there was no suppression because the trial court granted a continuance, in part, so that petitioner's expert could review the photographs at the hospital. It is clear that *Brady* does not require disclosure of evidence which, though exculpatory, is either in the possession of a defendant or which a defendant can obtain through the exercise of reasonable diligence. *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995); *United States v. Jones*, 34 F.3d 596, 600 (8th Cir. 1994); *United States v. Tormos-Vega*, 959 F.2d 1103, 1109 (1st Cir. 1992); *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991); *United States v. Newman*, 849 F.2d 156, 161 (5th Cir. 1988); *United States v. Steurer*, 942 F. Supp. 1183, 1190 (N.D. Ill. 1996). Even assuming that the information was suppressed for *Brady* purposes until Dr. Carter testified, the delayed disclosure did not amount to a *Brady* violation. Because the purpose of *Brady* is to permit a defendant to put all exculpatory information before the jury, "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (internal quotation omitted). "[I]f previously undisclosed evidence is disclosed, as here, during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure." *Norris v. Schotten*, 146 F.3d 314, 334 (6th Cir. 1998) (internal quotation omitted);

27

*accord Davis*, 306 F.3d at 421 ("Delay violates *Brady* only where the delay causes prejudice.");
*United States v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994). Here, the trial court granted a
continuance so that petitioner's expert could review the photograph. Although the expert apparently
did not do so, there is no evidence that this was the fault of the prosecutor.

Second, petitioner cannot show that the photograph was material. Under *Brady*, "[e]vidence
is material only if there is a reasonable probability that, had the evidence been disclosed to the
defense, the result of the proceeding would have been different. A 'reasonable probability' is a
probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S.
39, 57 (1987); *accord Strickler*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 682 (1985)
(Blackmun, J.). Although the photograph was not introduced, Dr. Carter testified at trial, based upon
his written report of the examination, that the colposcopy examination revealed a notch and tear at
the seven o'clock position of the victim's hymen. There is no suggestion that Dr. Carter's written
report or trial testimony did not accurately depict what would have been shown in the photograph.
Rather, the dispute between the experts, and between the prosecution and defense, was whether the
injuries found by the examination were consistent with, and demonstrated, digital penetration. In
light of the other overwhelming evidence of guilt, the jury resolved this dispute in favor of the
prosecution. Without any evidence that the picture would have demonstrated something different
from Dr. Carter's report, the picture would have added nothing to this dispute, nor aided the jury in
resolving the matter. Thus, petitioner has failed to establish that the photograph was material.

For these two reasons, the Court should conclude that petitioner is not entitled to habeas
relief on this claim.

H.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

*Paul J. Komives*

PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: March 29, 2005

29